UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAUL MATHIS,

                Plaintiff,                Case No. 4:15-cv-13052
                                              District Judge Terrence Berg
v.                                      Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (DE 18) AND TO DENY PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT (DE 16)**

**I.     RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Defendant's motion for summary

judgment (DE 18), **DENY** Plaintiff's motion for summary judgment (DE 16), and

**AFFIRM** the Commissioner's decision.

**II.     REPORT**

      Plaintiff, Paul Mathis, brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) for review of a final decision of the Commissioner of Social Security

("Commissioner") denying his application for social security disability insurance

benefits.  This matter is before the United States Magistrate Judge for a Report and

Recommendation on Plaintiff's motion for summary judgment (DE 16), the

Commissioner's memorandum in opposition and cross motion for summary judgment (DE 18), and the administrative record (DE 13).

### A. Background

Plaintiff filed his application for disability insurance benefits on March 22, 2013, alleging that he had been disabled since November 28, 2012. (R. at 134-140.) On April 15, 2013, Plaintiff filed an application for Supplemental Security Income ("SSI"), alleging the same disability date. (R. at 141-146.) Both of Plaintiff's applications were denied (R. at 77-84) and he sought a *de novo* hearing before an Administrative Law Judge ("ALJ"). (R. at 87-88.) ALJ Kim Nagle held a hearing on February 24, 2014 and subsequently determined that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 15-62.) On June 30, 2015, the Appeals Council denied Plaintiff's request for review. (R. at 1-4.) ALJ Nagle's decision became the Commissioner's final decision. Plaintiff then timely commenced the instant action.

### B. Plaintiff's Medical History

A February 10, 2010 radiological report of Plaintiff's spine from the Oakwood Hospital & Medical Center, Dearborn listed "[m]inimal degenerative changes." (R. at 238.) An April 25, 2010 report from the Oakwood Imaging Center of an MRI of Plaintiff's cervical spine revealed a "focal disc protrusion at

C6-C7 without significant spinal canal stenosis or neural foramina stenosis."[1]  (R. at 237.)

Plaintiff saw Ghazwan Atto, M.D., on January 12, 2012 for abdominal pain. (R. at 293-296.)  Dr. Atto noted that Plaintiff had hypertension and diabetes mellitus "without mention of complication" (R. at 293) and assessed Plaintiff as having "possible cholycystitis [sic]."  (R. at 295.)[2]  Dr. Atto also related that Plaintiff had back pain, but Plaintiff's musculoskeletal exam showed he had a "[n]ormal range of motion; muscle strength, and stability in all extremities with no pain on inspection."  (R. at 295.)  Plaintiff's body mass index ("BMI") was 41.61. (R. at 294.).[3]

---

[1] Spinal stenosis is defined as a "narrowing of the lumbar spinal column that produces pressure on the nerve roots resulting in sciatica and a condition resembling intermittent claudication and that usually occurs in middle or old age[.]"  http://www.merriam-webster.com/medical/spinal%20stenosis (last visited October 31, 2016).  Foramina is the plural of foramen, which is defined as "a small opening, perforation, or orifice . . . ."  http://www.merriam-webster.com/dictionary/foramina (last visited October 31, 2016).

[2] Cholecystitis is defined as "inflammation of the gallbladder[.]" http://www.merriam-webster.com/dictionary/cholecystitis (last visited October 31, 2016).

[3] BMI "is the ratio of an individual's weight in kilograms to the square of his or her height in meters $(kg/m^2)$."  Social Security Ruling (SSR) 02-1p, 2002 WL 34686281, at *2 (Sept. 12, 2002).  Citing the National Institutes of Health Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults, SSR 02-1p states that:

> For adults, both men and women, the Clinical Guidelines describe a BMI of 25-29.9 as "overweight" and a BMI of 30.0 or above as

On February 1, 2012, Plaintiff had an ultrasound at the Henry Ford Wyandotte Hospital.  (R. at 269.)  Kenneth Bartold, M.D., reported that the ultrasound was "unremarkable[,]" except for the presence of "[l]imited gallbladder sludge."  (*Id.*)  Dr. Bartold noted that further testing that same date showed "abnormal gallbladder function . . . ."  (R. at 270.)

Plaintiff saw Dr. Atto again on February 3, 2012 to discuss the ultrasound results.  (R. at 290-292.)   At that visit, Dr. Atto noted that Plaintiff's diabetes "is improving" and "has been managed with oral medications.  There are no associated symptoms. There are no pertinent negatives."  (R. at 290.)  As with Plaintiff's prior visit, his musculoskeletal exam showed him to have a "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection."  (R. at 292.)  Plaintiff's BMI was 42.78.  (R. at 291.)  Because Plaintiff indicated he wanted to have a cholecystectomy,[4] Dr. Atto referred Plaintiff to a surgeon, Fadi Baidoun, M.D.  (R. at 292.)

---

"obesity." The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. These levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss.

*Id.* (paragraph break omitted).

[4] A cholecystectomy is a "surgical excision of the gallbladder[.]" http://www.merriam-webster.com/dictionary/cholecystectomy (last visited October 31, 2016).

Dr. Baidoun met with Plaintiff on February 8, 2012 "to discuss his treatment options." (R. at 275.) After discussing the risks and benefits of surgery with Dr. Baidoun, however, Plaintiff "elected to proceed with surgery at a later date." (R. at 276.)

Plaintiff saw Ghassan Atto, M.D., on July 13, 2012, at which time Plaintiff reported being "[n]egative for abdominal pain . . . ." (R. at 287.) Because Plaintiff's diabetes and hypertension were "uncontrolled," Dr. Atto increased Plaintiff's medications. (R. at 289.) As before, Dr. Atto's musculoskeletal exam showed Plaintiff had a "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection." (R. at 288.) Plaintiff's BMI was 41.03. (R. at 287.)

Plaintiff returned to Dr. Ghazwan Atto on January 7, 2013. (R. at 281-285.) Dr. Atto remarked that Plaintiff's hypertension and diabetes were stable. (R. at 281.) Plaintiff had stable left knee pain, which "is aggravated by bending, climbing stairs and walking." (*Id.*) Plaintiff also reported having joint tenderness and weakness. (R. at 282.) Dr. Atto's musculoskeletal exam, however, showed that Plaintiff had a "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection." (R. at 283.) Plaintiff's BMI was 40.60. (R. at 282.) Dr. Atto prescribed a new diabetes medicine and restarted Plaintiff on an unspecified medicine for hypertension. (R. at 284.)

Plaintiff next saw Dr. Ghazwan Atto on February 13, 2013.  (R. at 277-280.)

Dr. Atto described Plaintiff's hypertension and diabetes as stable.  (R. at 277.)  The

notes of that visit confusingly state that Plaintiff "is compliant with medication"

but then state contrarily that Plaintiff "didn't start his [diabetes] medication[.]"

(*Id.*).  Plaintiff's BMI was 40.80.  (R. at 278)  As with the previous visits,

Plaintiff's musculoskeletal exam showed that he had a "[n]ormal range of motion,

muscle strength, and stability in all extremities with no pain on inspection."  (R. at

279.)  Dr. Atto had a "lengthy discussion" with Plaintiff about his diabetes and

adjusted his medications.  (*Id.*).

On May 6, 2013, Plaintiff again saw Dr. Ghazwan Atto.  (R. at 301-303.)

Dr. Atto noted that Plaintiff was "compliant" with his diabetes medication.  (R. at

301.)  Plaintiff's BMI was 41.61.  (R. at 302.)  Once again, Dr. Atto's

musculoskeletal exam showed Plaintiff to have a "[n]ormal range of motion,

muscle strength, and stability in all extremities with no pain on inspection."  (*Id.*)

Dr. Atto added a new medication for Plaintiff's diabetes, which he classified as

"uncontrolled . . . ."  (R. at 303.)

On June 13, 2013, Plaintiff was seen at a gastroenterologist's office for

rectal pain. (R. at 312-313.)  The record of that visit is in the form of a letter to Dr.

Ghazwan Atto written on the office stationery of Stephen Watts, M.D.  However,

the letter was signed by Bridget Bonello, NP (presumably nurse practitioner).  (R.

at 313.)  According to Nurse Bonello's letter, Plaintiff was going to later undergo a colonoscopy, but there is no indication in the record that he actually did so.

Later in June 2013, state agency physician Michael Parish, M.D. reviewed the medical record.  (R. at 64-68, 71-74.)  Dr. Parish opined that Plaintiff did not have any severe impairments (R. at 67, 73) and, consequently, was not disabled. (R. at 68, 74.)

On September 20, 2013, Plaintiff returned to Dr. Ghazwan Atto.  (R. at 304-307.)  Dr. Atto's notes of that visit reflect that Plaintiff "states he has no complaints [and] is here for a checkup[.]"  (R. at 304.)  Dr. Atto noted that Plaintiff's hypertension had "no associated symptoms" and his diabetes was "stable[,]" with  "no associated symptoms." (*Id.*)  Plaintiff's BMI was 41.00.  (R. at 305.)  Yet again, Plaintiff's musculoskeletal exam showed a "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection." (R. at 306.)  Dr. Atto noted in the "Assessment/Plan" section of his notes that Plaintiff's obesity was discussed, along with "life style [sic] modification and exercise." (*Id.*)  Despite classifying it as stable elsewhere in the notes, Dr. Atto also stated that Plaintiff's diabetes was "uncontrolled" so he had a "lengthy discussion with [Plaintiff] about the importance of controlling BS [presumably blood sugar] . . . ." (*Id.*)

Finally, Plaintiff saw Dr. Ghazwan Atto again on December 30, 2013.  (R. at 308-311.)  Dr. Atto described Plaintiff's diabetes and hypertension to each be "stable."  (R. at 308.)  Plaintiff's BMI was 41.20.  (R. at 309.)  Plaintiff's musculoskeletal exam again showed a "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection."  (R. at 310.)  Dr. Atto noted that Plaintiff's hypertension was "fairly controlled, lifestyle modification." (R. at 311.)  As for the diabetes, Dr. Atto stated that it was "uncontrolled, [Plaintiff] doesn't have insurance and cannot afford insulin at this time . . . . Lifestyle modification."  (*Id.*).[5]

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the February 24, 2014 hearing before the ALJ, Plaintiff reported that he was forty-three years old (R. at 38), five feet teen inches tall and weighed 280 pounds.  (R. at 39.)  Plaintiff testified that he stopped working sometime in 2012.

---

[5] There are also numerous pages of extremely difficult to read, handwritten medical notes in the record.  (R. 239-265.)  Plaintiff does not cite to those notes at all in his motion for summary judgment (in fact, Plaintiff's statement of facts is only two paragraphs long and contains no citations to the record).  (DE 16 at 9.)  The Commissioner only briefly summarizes the handwritten notes, remarking mainly that they list Plaintiff as being obese and having "sought treatment for occasional exacerbations of his chronic neck pain in 2009 and 2010 . . . ."  (DE 18 at 4.)  Thus, the Court will not attempt to further parse those notes.

(R. at 40.)  When asked by the ALJ why he stopped working, Plaintiff gave the following convoluted answer:

> Well a few years before I was having severe problems, and when I would be sent out on a job—the way it works with the local, I get sent out on a job.  If they can't perform the job, they would have to find a [sic] alternate job for me, and it's hard to keep me employed, you know, under full pay compared to a guy that can do all the jobs.  And so I would end up getting laid off a day after.  You know, I would go out for one day, and I would get laid off.  And that happened quite a few times.

(R. at 41.)  Despite having the opportunity to do so, his counsel failed to elicit any elucidating testimony through follow-up questions.

Plaintiff testified that he worked as a cement mason "for approximately 10 to 15 days" in 2012.  (R. at 40-41.)  Previously, Plaintiff worked as a truck inspector, which he stated was his only full-time job in the previous fifteen years.  (R. at 41-42.)  Plaintiff stated that truck inspector job required him to lift "about 100 pounds . . . ." (R. at 41.)

The ALJ then returned to why Plaintiff ceased working and the following colloquy ensued:

> Q  So you were laid off in 2012?
>
> A  Yeah.  Well I mean that—2012 was just basically a hit and miss.  I'd go out with[--] like I said with[--] a company for a day, and then I would get laid off.  And then I would go out with another company for a day.  I would get a call, and that morning if a company needed somebody and they were short-handed.

Q  Have you been called out for any work by the union since then?

A  Not in the past—they haven't called me in probably about a year because they know.  I talked to my BA about my situation.

Q  And what do you mean by BA?

A  Business associate, I guess.  He does—he finds—

Q  He's like your union [INAUDIBLE]?

A  Yeah, he's my union person, my contact for work.

Q  Have you applied for any work anywhere else?

A  No.

Q  Since November 2012?

A  No, I have not.

(R. at 42-43.)

The ALJ then asked Plaintiff what his typical days entailed.  Plaintiff responded that he drove his son to and from the bus stop and "just cope[d] with the way my pain is.  You know, I take my pills and basically try and be out of pain." (R. at 43.)  Plaintiff stated he prepared simple food for himself, watched television, went to the store "maybe" once per week and took care of his personal hygiene needs but did not perform any household chores or yard work.  (R. at 43-44.)

The ALJ later asked Plaintiff what "impairments or . . . conditions" prevent him from working, to which Plaintiff responded that he had "severe" neck pain which "goes up to where I have to basically lay down and just rest.  I can't move . . . . And it radiates through my head and through my shoulders, down my arm." (R. at 45.)  Plaintiff claimed to have neck pain "all the time[,]" including at that moment.  (*Id.*)  Plaintiff stated his neck pain became constant "about a year and a half" ago and "[m]ovement" triggered or exacerbated the pain.  (R. at 45-46.)

Plaintiff testified that he used Vicodin "once or twice every couple of weeks" and had done so since "about 2010[,]" but Vicodin causes him to become sleepy.  (R. at 46-47.)  Plaintiff also stated that he had been using medical marijuana for about two years, and he used it "[p]robably about four to five times a day."  (R. at 46.)  When asked about side effects from the marijuana, Plaintiff responded "[s]ometimes it makes me a little sleepy, but no.  There's no—not much side effects anymore."  (R. at 47.)

As for his diabetes, Plaintiff asserted that he was taking medicine but it was not helping control his blood sugar.  (R. at 48.)  According to Plaintiff, he cannot afford the insulin prescribed by Dr. Atto.  (*Id.*)  When the ALJ asked if Plaintiff had any side effects from any other medications, Plaintiff responded that he took "a high blood pressure pill with a water pill, and it makes me go to the bathroom quite a bit."  (*Id.*)

Plaintiff estimated he could sit for twenty to thirty minutes before needing to support his neck and could also stand about twenty to thirty minutes.  (R. at 49.) Depending on the terrain, he estimated he could walk about fifteen to twenty minutes and could lift "maybe 10 to 15 pounds for a short time."  (R. at 49-50.) Finally, he asserted that he experienced pain in his feet due to diabetes and, consequently, needed to elevate them in the mornings for about fifteen minutes. (*Id.*)

Plaintiff's counsel then asked Plaintiff what type(s) of movement worsened his neck pain, to which Plaintiff eventually responded that "basically any movement" exacerbated the pain.  (R. at 51.) When asked about his need to use the bathroom, he stated that shortly after taking his medicine he "probably [is] going every 15 to 20 minutes . . ." and he went to the bathroom "[m]aybe 14, 15 times a day . . . ."  (R. at 51-52.)  Plaintiff said that he slept only two and one-half to three hours at night but also took "[a]bout four naps a day[,]" lasting "[h]alf [an] hour to maybe two hours sometimes."  (R. at 52.)  Finally, when asked if he had trouble reaching over his head, Plaintiff responded "[y]eah, and if I have to do it a couple times, I get real bad pain in my shoulders and my neck."  (R. at 53.)

### 2.    Vocational Expert Testimony

Michelle Peters-Pagella also testified at the hearing as a Vocational Expert ("VE").  (R. at 54-62.)  She classified Plaintiff's work as a cement mason and truck

12

inspector as heavy/very heavy, as performed.  (R. at 54-55.)  The ALJ then asked

the following lengthy hypothetical question:

> I'm going to ask you a series of hypothetical questions and ask you to
> assume an individual of the claimant's age, education, and work
> history.  And I'll ask you whether or not such an individual could
> perform any of the claimant's past work or any other work. . . .
> Assume medium exertional ability with the following postural
> limitations:  no more than frequently climbing ladders, ropes, or
> scaffolds, kneeling, or crawling.  It's all frequent.  Furthermore, with
> regard to rotation, flexion, or extension of the neck, that's also
> frequent.  So no repetitive.  No repetitive rotation, flexion, or
> extension of the neck.  Bilateral overhead reaching is limited to
> frequent.  The individual should avoid concentrated exposure to
> rough, uneven terrain.  And environmental limitations, would restrict
> them to no more than frequent exposure to excessive vibration and
> frequent exposure to hazards such as dangerous moving machinery
> and unprotected heights.  Given those limitations, would that allow for
> any of the past work as generally performed?

(R. at 55-56.)  The VE responded "[j]ust truck inspector, your honor."  (R. at 56.)

The ALJ then asked if there could be "[a]ny other unskilled medium work[,]" and

the VE responded by stating such a person could work in "assembly type

positions," as a sorter and in "janitorial type positions . . . ."  (R. at 56-57.)  The

VE classified all of those positions as medium and unskilled.  (R. at 57.)  The VE

stated that there were approximately 3,000 assembly positions in Michigan and

485,000 in the national economy, approximately 2,500 sorter positions in Michigan

and 435,000 in the national economy and approximately 4,000 janitorial positions

in Michigan and 525,000 in the national economy.  (R. at 56-57.)

The ALJ also asked the VE to "assume all the same limitations [detailed in the previous hypothetical], but the exertional level would be light.  I presume that would allow for the truck inspector still as defined in the DOT [Dictionary of Occupational Titles]."  (R. at 57.) The VE responded "[y]es, ma'am."  (*Id.*)  When asked if there were any "light unskilled jobs that would fit hypothetical number two[,]" the VE listed "assembly type positions" and "hand packaging" positions. (R. at 57-58.)   The VE estimated that there were approximately 3,800 assembly positions at the light level in Michigan and 535,000 in the national economy and at that light level there were approximately 2,000 hand packaging positions in Michigan and 385,000 in the national economy.  (*Id.*)

The ALJ then asked a third hypothetical question , which was "would a restriction to limiting jobs that permit ready access to restroom facilities and would not require an immediate replacement during unscheduled bathroom break[s] affect either of the foregoing hypotheticals or the testimony that you gave?"  (R. at 58.) The VE responded "[n]o, your honor."  (*Id.*)  The ALJ then followed up by asking "so they would put ready access to restroom facilities, would not require an immediate replacement during an unscheduled bathroom break such that the individual is not off task more than 10 percent of the work period, that would be allowed by truck inspector and the five unskilled jobs that you identified?"  (*Id.*)

14

The VE answered "[y]es, your honor."  (*Id.*)  The ALJ later inquired whether the

VE's testimony was consistent with the DOT, and the VE answered:

> Yes, other than the breaks that were just discussed, your honor.  My testimony would be consistent with the Dictionary of Occupational Titles.  The rest of that would be based upon my experience performing direct job placement services, labor market research, and videotapes that have been held consistently for the last 19 years.

(R. at 58-59.)

Shortly thereafter, Plaintiff's then-counsel asked the VE if changing the

rotation, flexion and extension of the neck to occasional would "erode the base of

jobs or eliminate work."  (*Id.*).  The VE responded that "[i]t would with the

occasional flexion or rotation of the neck[,]" and explained that assembler and

sorter were static positions but truck inspector and janitorial positions "are going to

require more frequent extension, flexion, and rotation of the neck."  (R. at 59-60.)

The VE later clarified that limiting the aforementioned movements to occasional

would eliminate the janitorial and truck inspector positions and would erode the

sorter and assembler positions by "at least 50 percent."  (R. at 60.)   The VE

testified that a requirement that an individual elevate his/her legs by eighteen

inches for thirty minutes per day would "eliminate work."  (R. at 61.)

## D.  THE ADMINISTRATIVE DECISION

On March 21, 2014, the ALJ issued her decision.  (R. at 18-29.)  At Step 1

of the sequential evaluation process,[6] the ALJ found that Plaintiff had not engaged

in substantial gainful activity since his alleged onset date of November 28, 2012.

(R. at 21.)

At Step 2, the ALJ found that Plaintiff had the following severe

impairments: "obesity and a cervical spine protrusion . . . ."  (*Id.*)  Because it

caused "no functional limitations[,]" the ALJ found Plaintiff's diabetes was a non-

severe impairment.  (*Id.*)  Similarly, though the ALJ "accommodated the

claimant's allegations of urinary frequency" in her residual functional capacity

---

[6] Social Security Regulations require ALJs to resolve a disability claim through a
five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).
Although a dispositive finding at any step terminates the ALJ's review, *see Colvin
v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered the sequential
review considers and answers five questions:

  1.   Is the claimant engaged in substantial gainful activity?
  2.   Does the claimant suffer from one or more severe impairments?
  3.   Do the claimant's severe impairments, alone or in combination, meet
       or equal the criteria of an impairment set forth in the Commissioner's
       Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1?
  4.   Considering the claimant's residual functional capacity, can the
       claimant perform his or her past relevant work?
  5.   Considering the claimant's age, education, past work experience, and
       residual functional capacity, can the claimant perform other work
       available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th
Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

("RFC") determination,[7] the ALJ found that Plaintiff's hypertension was non-severe because "[t]here is no evidence that . . . [it] imposes any limitations on his ability to perform work activity . . . ."  (*Id.*)

At Step 3, the ALJ concluded that Plaintiff's "medically determinable minimal amount of marijuana dependence" was non-severe because it "does not cause more than minimal limitation in [his] ability to perform basic mental work activities . . . ."  (*Id.*)   The ALJ then found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 23-24.)

Prior to undertaking Step 4 of the sequential process, the ALJ evaluated Plaintiff's RFC and determined that he had the capacity to perform medium work[8] with the following limitations:

> [T]he claimant can perform no more than frequent climbing of ladders, ropes or scaffolds, kneeling and crawling.  He can perform no repetitive rotation, flexion or extension of the neck.  The claimant is capable of no more than frequent bilateral overhead reaching.  He is to

---

[7] The claimant's "residual functional capacity" is an assessment of the most he or she can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

[8] Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. §404.1567(c).  In addition, someone who can perform medium work can also presumptively perform light and sedentary work.  *Id.*

avoid all concentrated exposure to rough or uneven terrain. The claimant can tolerate no more than frequent exposure to excessive vibration, dangerous moving machinery and unprotected heights. Due to urinary frequency caused by the claimant's reported side effects of hypertensive medication, the claimant would be limited to jobs that permit ready access to restroom facilities and would not require an immediate replacement during an unscheduled bathroom break. The claimant would be expected to be off task no more than 10% of the workday due to unscheduled bathroom breaks.

(R. at 24.) The ALJ then concluded at Step 4 that Plaintiff could perform his past work as a truck inspector. (R. at 27-28.)

Despite concluding that Plaintiff could perform his past work at Step 4, the ALJ nonetheless engaged in a Step 5 analysis. At Step 5, the ALJ concluded that Plaintiff was capable of performing other jobs that exist in significant numbers in the national economy. (R. at 27-29.) Specifically, the ALJ determined that Plaintiff could work as an assembler, a sorter and a janitor. (R. at 28-29.) The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 29.)

## E.  STANDARD OF REVIEW

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."). Furthermore, the claimant "has the ultimate burden to establish an entitlement to benefits by proving the existence of a disability." *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this

Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## F. ANALYSIS

In his motion for summary judgment, Plaintiff asserts that "the ALJ's decision does not comply with SSA Rules and Regulations at Step Four." (DE 16 at 11) (capitalization standardized). Though not specifically listed as an issue in Plaintiff's motion, he also argues that the ALJ's credibility determination was improper, which would otherwise be a distinct issue. Unfortunately, the scattershot, stream of consciousness-type nature of Plaintiff's motion makes it difficult to discern which portions pertain to the RFC issue and which pertain to the credibility issue.

20

The Commissioner opposes Plaintiff's motion, asserting that she is entitled to summary judgment because substantial evidence supports the ALJ's conclusions.  I agree with the Commissioner.

### 1.  Plaintiff's Arguments Are Insufficiently Developed

Plaintiff's motion for summary judgment is detrimentally conclusory, as is highlighted by the fact that the "argument" section of his motion is only slightly more than four pages long.  For example, Plaintiff makes sundry assertions that, essentially, the ALJ failed to thoroughly discuss the evidence and applicable law; yet Plaintiff himself does not thoroughly discuss what specific, germane evidence the ALJ allegedly failed to discuss adequately.[9]  Notably, Plaintiff's motion contains no discussion whatsoever of the medical evidence.  This omission is rendered more glaring by, among other things, Plaintiff's vague accusation that the

---

[9] Plaintiff asserts that the "ALJ has a duty to investigate the facts and develop the arguments both for and against granting benefits."  (DE 16 at 11.)  Though it is not entirely clear whether Plaintiff intends to make such an argument, if that language is construed as an argument that the ALJ failed to meet a duty to fully develop the record, such an argument would be without merit.  Plaintiff was represented by counsel at the hearing before the ALJ (albeit not his current counsel) and has not shown the existence of other special circumstances which would place a heightened duty upon the ALJ to additionally develop the record.  *See, e.g., Trandafir v. Comm'r of Soc. Sec.*, 58 Fed. App'x 113, 115 (6th Cir. 2003) ("The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). Only under special circumstances, i.e., when a claimant is without counsel, is not capable of presenting an effective case, and is unfamiliar with hearing procedures, does an ALJ have a special, heightened duty to develop the record.").

ALJ failed to discuss Plaintiff's "knee neuropathy[.]"  (DE 16 at 12.)  Plaintiff fails
to specify the nature of his knee problem(s) or how his "knee neuropathy" entitles
him to relief.[10]

As this Court recently held regarding a similar motion for summary
judgment in a Social Security case, Plaintiff's "almost complete lack of argument
development renders the majority of his arguments waived. '[I]ssues adverted to in
a perfunctory manner, unaccompanied by some effort at developed argumentation,
are deemed waived. It is not sufficient for a party to mention a possible argument
in the most skeletal way, leaving the court to ... put flesh on its bones.'"  *Spiteri v.
Colvin*, 2015 WL 7258749, at *3 (E.D. Mich. Nov. 9, 2015) (Stafford, M.J.)
(footnote omitted), *report and recommendation adopted at* 2015 WL 8538036
(E.D. Mich. Dec. 11, 2015) (Michelson, J.) (quoting *McPherson v. Kelsey,* 125
F.3d 989, 995–96 (6th Cir. 1997)) (footnote, citation and internal quotation marks
omitted).[11]  The administrative record in this case is over 300 pages long, and the

---

[10] Plaintiff did complain of knee pain during a January 2013 visit to Dr. Atto but did
not repeat that claim subsequently, nor did Dr. Atto note any disabling effects
stemming from that one complaint of knee pain.

[11] Plaintiff's current attorney, Joshua Moore, was also counsel for Plaintiff *Spiteri.*
He has repeatedly been warned about this (and about mischaracterization of the
record) by the Undersigned and by other judges of this Court.  *See Lapprich v.
Comm'r of Soc. Sec.*, No. 15-cv-13290-AC-APP, 2016 U.S. Dist. LEXIS 105568,
at *21-24, 41-44 (E.D. Mich. July 18, 2016) (Patti, M.J.)*; Rhodes v. Colvin*, No.
CV 14-13716-AC-EAS, 2015 WL 6509151, at *3 (E.D. Mich. Oct. 7, 2015)
(Stafford, M.J.) (observing that the ALJ had been seriously misrepresented), *report*

*and recommendation adopted sub nom. Rhodes v. Comm'r of Soc. Sec.*, No. 14-13716-NGE-PTM, 2015 WL 6796594 (E.D. Mich. Nov. 6, 2015); and *Davis v. Commissioner of Soc. Sec.,* No. 15-13028, 2016 U.S. Dist. LEXIS 90217, *23 (E.D. Mich. June 15, 2016) (Morris, M.J.) ("Plaintiff raises a number of underdeveloped arguments and generalized accusations of ALJ misfeasance with little citation to case law or the administrative record."), *report and recommendation adopted*, (E.D. Mich. July 12, 2016) (Edmunds, J.). Yet counsel persists. He has attempted to excuse himself by claiming that the problem stems from the failure of the "newly appointed Magistrate Judges" to appreciate his "very zealous" style of advocacy (*see Cason v. Commisioner*, 15-cv-12661, DE 21, Pg ID 625-626; *Lapprich*, No. 15-13290, DE 20, Pg ID 1033 (July 20, 2016)); however, this explanation fails to account for the same criticisms being lodged by then Chief Judge Rosen, District Judges Tarnow and Michelson, and Executive Magistrate Judge Whalen, none of whom can be accurately characterized as "newly appointed Magistrate Judges." *See Roberts v. Comm'r of Soc. Sec.*, No. 14-11994-GER-APP, 2015 WL 5439725, at *2 (E.D. Mich. Sept. 15, 2015) (Rosen, C.J.) ("Such hyperbole and generalized accusations of ALJ misfeasance are no substitute for engagement with the actual evidence in the administrative record….Failure to adhere to these standards will result in the imposition of sanctions and possible referral of counsel for disciplinary proceedings."); *Gower v. Comm'r of Soc. Sec.*, No. 13-14511-AJT-PTM, 2015 WL 163830, at *8, 23 (E.D. Mich. Jan. 13, 2015) (Tarnow, J., adopting report and recommendation of Morris, M.J.) ("Rather than heed this warning and identify supporting evidence, Plaintiff has merely reiterated her claim that such evidence has been overlooked." And, "Plaintiff's analysis…suffers all the evils it finds in the ALJ's. First, it is inaccurate. . . . Moreover, [it] makes little effort to show why she is disabled."); *Harper v. Comm'r of Soc. Sec.*, No. 2:14-CV-11630-LJM-EAS, 2015 WL 4509076, at *4 (E.D. Mich. July 24, 2015) (Michelson, J., adopting report and recommendation of Stafford, M.J.) (remanding but recognizing that "[t]he majority of Harper's arguments are cursory and underdeveloped."); *Robertson v. Comm'r of Soc. Sec.*, No. 14-14002-MOB-RSW, 2015 U.S. Dist. LEXIS 175601, at *21 (E.D. Mich. October 29, 2015) (Whalen, M.J.) (referring to counsel's criticisms of the ALJ as "scattershot" and one contention as "particularly specious"). Moore has also informed the Court that he "has made several attempts to modify writing style and include what the Judges are seeking[,]" *Lapprich*, No. 15-13290, DE 20, Pg ID 1032, further asserting that, "I have taken the Magistrate Judges['] concerns very seriously and have since they started making these complaints[, and that he has] "made significant changes to my writing style and to include what the Magistrate Judges are seeking." *Cason*, 15-cv-12661, DE 21, Pg ID 626. Unfortunately, even

Court will not search the record for potential arguments or evidence beneficial to Plaintiff. *Jones v. Comm'r of Soc. Sec.*, 2013 WL 4748083, at *8 (N.D. Ohio Sept. 4, 2013) ("[I]t is not the Court's function to search the administrative record for evidence to support [Plaintiff's] 'argument' or find law supporting [his or] her claims. This Court does not conduct a de novo review in social security proceedings, and certainly cannot be expected to craft an argument on [Plaintiff's] behalf.") (quotation marks and citations omitted).

### 2. The RFC Assessment

A plaintiff's RFC is "the most [he or she] can still do despite the physical and mental limitations resulting from [his or] her impairments." *Poe v. Comm'r of*

---

a casual review of the social security briefs he has filed with this Court *subsequent* to many of the warnings and criticisms cited above, going all the way back to Judge Tarnow's January 13, 2015 admonishment and also well after the plethora of criticism received from various judicial officers throughout 2015, reveals that the promised "changes" have not been forthcoming. His brief in the instant matter, by way of example only, was filed on April 27, 2016. (*See* DE 16 herein.) It is not an isolated example. *See Soucie v. Comm'r of Soc. Sec.,* No. 16-cv-10576-DML-APP, DE 18, Pg ID 511-513 (October 24, 2016 Report and Recommendation of Patti, M.J.) (finding a motion for summary judgment submitted by Attorney Moore on May 14, 2016 (DE 15) to be, among other problems, fatally conclusory); *Luxton v. Comm'r of Soc. Sec.*, No. 15-cv-13758-TLL-APP, DE 18, Pg ID 392-393 (October 26, 2016 Report and Recommendation of Patti, M.J.) (describing a motion for summary judgment submitted by Attorney Moore on February 13, 2016 (DE 13) to be "frustrating" because, among other problems, there was a "lack of clearly defined issues . . . ."). Judge Cox has recently referred Attorney Moore to Chief Judge Hood and the Attorney Grievance Commission for the same types of shortcomings described herein. *Cason, supra.* at  DE 22, Pg ID 636, 2016 U.S. Dist. LEXIS 117826, at *5.

*Soc. Sec.*, 342 Fed. App'x 149, 155 (6th Cir. 2009); s*ee also* 20 C.F.R. §§ 404.1545(a), 416.945(a).  The determination of Plaintiff's RFC is an issue reserved to the Commissioner and must be supported by substantial evidence.  20 C.F.R. §§ 404.1527(3), 416.927(e).  "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'"  *Simpson v. Comm'r of Soc. Sec.*, 344 Fed. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).

Pursuant to Social Security Ruling 96-8p, which Plaintiff asserts the ALJ ignored, an RFC assessment must include:

> [A] narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).   In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96-8p, 1996 WL 374184, at *6-7 (July 2, 1996). "Although SSR 96–8p requires a 'function-by-function evaluation' to determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged." *Delgado v. Comm'r of Soc. Sec.*, 30 Fed. App'x 542, 547 (6th Cir. 2002). Instead, the ALJ "'need only articulate how the evidence in the record supports the

RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.'" *Id.* (quoting *Bencivengo v. Comm'r of Soc. Sec.,* No. 00–1995,  251 F.3d 153, slip op. at 5 (3d Cir. Dec. 19, 2000)).

### a.  Ability to Perform Medium Work

Even if the Court leniently overlooks the previously discussed foundational deficiencies in Plaintiff's motion, Plaintiff's RFC-based argument fails because the ALJ's RFC conclusion is supported by substantial evidence.  Plaintiff asserts that the ALJ "never explains to the reader how someone with the severe impairments found by the ALJ can do the exertional demands of medium work."  (DE 16 at 11.) Plaintiff is correct in that the ALJ did not discuss in her opinion the specific exertional demands of medium work.  However, she did cite to 20 C.F.R. §§ 404.1567(c) and 416.967(c), which define medium work.  (R. at 24.) Plaintiff has not shown that additional discussion was required.  At best, the ALJ's failure to discuss at length the requirements of medium work was a harmless error, as the omission of such an extended discussion had no discernible effect on Plaintiff's entitlement to relief.

In addition, the ALJ's opinion contains a detailed summary and discussion of Plaintiff's medical treatment.  (R. at 21-26.)  Crucially, the ALJ correctly notes that Plaintiff "has had only minimal treatment for his alleged cervical spine

issues." (R. at 26.) Moreover, the ALJ explicitly "accommodated the substantial limitations arising from the claimant's obesity and cervical disc protrusion, as well as his non-severe impairments of diabetes, and hypertension, in limiting him to a reduced range of medium work." (R. at 25.)

Simply put, and as the ALJ correctly noted, there is <u>no</u> medical evidence showing that Plaintiff is impaired, much less disabled. To the contrary, Dr. Parish opined that Plaintiff did not even have any severe impairments. (R. at 67, 73.) Accordingly, the ALJ's conclusion that Plaintiff could perform medium work (with the aforementioned restrictions), is significantly more generous to Plaintiff than the medical evidence would require.

In fact, the ALJ explicitly took Plaintiff's severe and non-severe impairments into account. First, the ALJ accommodated Plaintiff's obesity by restricting him to medium work and limiting his postural movements and exposure to uneven terrain. (R. at 25.)[12] Second, the ALJ explicitly took Plaintiff's

---

[12] Plaintiff's motion makes scant references to his obesity. To the extent he may be construed as attempting to argue that his obesity requires a finding that he is disabled, any such argument would be without merit. Though Plaintiff's BMI was consistently over 40, SSR 02-1p explains that "[t]here is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment." 2002 WL 34686281, at *4. Therefore, SSR 02-01p "does nothing to relieve [Plaintiff] of the burden of marshaling competent medical opinion and evidence to show *specifically* how [his] obesity exacerbated [his] other impairments, or interacted with them, to render [him] incapable of all suitable work. In the context of judicial review of the ALJ's decision, [Plaintiff] had the burden of showing specifically how the obesity, in combination with other impairments, limited [his] ability to a degree

medication-induced need to urinate frequently into account by restricting him to jobs that allow ready access to restroom facilities.  (*Id.*)  Notably, the VE opined that this would not be work preclusive.  (R. at 58.)  Third, the ALJ explicitly took Plaintiff's cervical disc protrusion into account by limiting his: crawling, rotation/flexion/extension of the neck, overhead reaching and exposure to vibration.  (R. at 25.)  Finally, the ALJ accommodated Plaintiff's marijuana dependency, hypertension and diabetes by limiting his exposure to climbing ladders/ropes/scaffolds and exposure to dangerous machinery and unprotected heights.  (*Id.*)  Nothing further was required.

### b.  Subjective Complaints

Next, the ALJ did not simply ignore Plaintiff's subjective complaints.  In fact, the ALJ's decision expressly addresses those complaints, relating that Plaintiff "testified that he currently has neck pain that radiates through his head and into his shoulders and arms.  He claimed that he could not lift more than fifteen pounds and was unable to sit, stand or walk for long periods. . . . The claimant alleged that he has 'foot pain' as a complication of his diabetes and is forced to elevate his feet for fifteen minutes every morning . . . ." (R. at 26.)[13]  The ALJ

---

inconsistent with the ALJ's RFC determination."  *Smith v. Astrue*, 639 F.Supp.2d 836, 846-47 (W.D. Mich. 2009).  Plaintiff has made no such showing here.

[13] Plaintiff's argument that the ALJ "never factors Mr. Mathis' severe fatigue and severe pain within the RFC" is similarly without merit.  The ALJ explicitly

concluded those subjective complaints were not entirely credible because "the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those described in this decision."  (R. at 27.)  In short, Plaintiff has failed to identify specific, cognizable errors which necessitate relief stemming from the ALJ's assessment of his subjective complaints. The Court will not search the record with a fine-toothed comb to develop arguments for Plaintiff.  *See, e.g., Davis v. Comm'r of Soc. Sec.,* 2016 WL 4445774, at *10 (E.D. Mich. July 29, 2016) (Patti, M.J.) ("Having already concluded that the treating physician's [Dr. Verma's] opinions were properly discounted, the Court has no affirmative duty to go through the state agency reviewer's (or the consultative examiner's) findings with a fine-toothed comb to verify consistency with the 379-page record, particularly where Plaintiff has failed to use the adversarial process to point out any inconsistencies."), *report and recommendation adopted at* 2016 WL 4429641 (E.D. Mich. Aug. 22, 2016) (Leitman, J.).

---

discussed Plaintiff's radiating neck pain and also discussed his sleepiness (i.e., fatigue).  (*See*  R. at 22) ("The claimant testified that his medical marijuana dependence does make him 'sleepy' and I considered this in light of the claimant's ability to concentrate, persist and keep pace.  However, even given the claimant's alleged sleepiness, he has exhibited a very functional mental state.").  Moreover, the ALJ permissibly commented on his alert demeanor at the hearing.  (*Id.*)  An ALJ is in a unique position to observe the demeanor of a witness, and such observations are entitled to great weight.  *Infantado v. Astrue*, 263 Fed. App'x 469, 475 (6th Cir. 2008).

### c.  SSR 96-8p

Plaintiff's also argues, albeit with minimal detail, that the ALJ failed to comply with SSR 96-8p.  The extent of Plaintiff's argument—which is the same basic argument the Court has seen Plaintiff's counsel raise in previous cases--is a block quotation of a portion of SSR 96-8p, followed by a vague and conclusory assertion that the ALJ "never complied or even attempted to reconcile Social Security Ruling 96-8p with her decision."  (DE 16 at 14-15.)[14]  Plaintiff's argument is woefully underdeveloped.  Moreover, it is otherwise without merit.

As previously discussed, the portion of SSR 96-8p quoted in Plaintiff's motion provides in relevant part that an ALJ's RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)" and the ALJ also "must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work

---

[14] Plaintiff's counsel likes to pepper his briefs with the word "never" when pointing to the ALJ's alleged deficiencies; however, as pointed out in a previous report, this dramatic phraseology is often belied by the words of the ALJ's actual opinion. *See, e.g., Lapprich* ,  DE 19 (July 18, 2016 report and recommendation) (Patti, M.J.) ("Plaintiff's counsel is cautioned that the use of emphatic but inaccurate statements—such as his repeated use of words and phrases like 'never,' 'makes no attempt,' and 'did not' (DE 16 at 14, 15, & 16)—to describe the ALJ's analysis seriously detracts from the credibility of his arguments and does not exhibit the candor toward the tribunal expected by this Court."), *report and recommendation adopted in part at* 2016 WL 4204133 (E.D. Mich. Aug. 10, 2016) (Cohn, J.).

schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." 1996 WL 374184, at *7 (footnote omitted).

Although the ALJ did not explicitly discuss SSR 96-8p at length in her decision, she did satisfy its requirements.  First, the ALJ recited Plaintiff's medical history and then stated why she found Plaintiff's subjective complaints to not be entirely credible.  (R. at 25-27.)  This Court has previously rejected a strikingly similar argument made by Plaintiff's counsel in this area.  *See Houston v. Comm'r of Soc. Sec.*, 2015 WL 5752720, at *25-26 (E.D. Mich. Aug. 25, 2015) (Morris, M.J.) ("Tucked at the end of her credibility argument, Plaintiff includes a brief paragraph block quoting SSR 96–8p and concluding, 'Curiously, the ALJ never complied or even attempted to reconcile Social Security Ruling 96–8p with his decision.' . . . Plaintiff does not explain how the ALJ disregarded this Ruling. Her argument seems to relate to her credibility argument, in which she accuses the ALJ of 'severely mistat[ing] and misquote[ing]' Plaintiff.  She does not, however, provide any examples of these misstatements. She continues, 'The ALJ decision [sic] defies logic. There is never any explanation for the ALJ credibility [sic] decision' and it seemed to contradict his statements at the hearing.  Again, she fails to flag the logical fallacies riddling the decision. . . .  Overall, his decision considered the evidence, including Plaintiff's testimony, and found that the

objective measures indicated her impairments were less severe than claimed. I suggest that substantial evidence supports this conclusion and that the ALJ did not violate SSR 96–8p.") (citations omitted), *report and recommendation adopted at* 2015 WL 5729079 (E.D. Mich. Sept. 30, 2015) (O'Meara, J.).

Moreover, though the ALJ's decision does not contain an explicit, extended discussion of the Plaintiff's ability to perform work on a regular and recurring basis, such a finding is generally deemed to be encompassed implicitly by an ALJ's RFC finding. *See, e.g., Trischler v. Comm'r of Soc. Sec.*, 2015 WL 5016600, at *20 (E.D. Mich. Aug. 24, 2015) (Borman, J., adopting the report and recommendation of Morris, M.J.) (holding that "the RFC implicitly encompasses this [ability to perform work on a regular basis] finding" and consequently "[m]ost courts do not require any discussion.").[15]  In addition, the ALJ's decision defined the RFC as Plaintiff's "ability to do physical and mental work activities on a sustained basis despite limitations from his impairments."  (R. at 20.)   The usage of the phrase "'sustained basis' suggests that the ALJ considered Plaintiff's capacity to work for an extended period." *Trischler*, 2015 WL 5016600, at *21. Moreover, at one point in her opinion the ALJ noted that "obesity may limit an individual's ability to sustain activity on a regular and continuing basis during an eight-hour day, five-day week or equivalent schedule."  (R. at 23.)  The ALJ also

---

[15] Plaintiff's counsel was also the attorney for Plaintiff *Trischler.*

cited SSR 96-8p when discussing what must be considered in arriving at an RFC assessment.  (*See* R. at 20.)  Plaintiff's bare bones argument to the contrary notwithstanding, no further findings or discussion are required to comply with SSR 96-8p.

In short, perhaps the ALJ's RFC determination was not ideally drafted. Nonetheless, the RFC determination is supported by substantial evidence and Plaintiff has failed to show any errors thereto which entitle him to relief.

### 3. **The ALJ's Assessment of Plaintiff's Credibility**

Plaintiff asserts in conclusory and hyperbolic fashion that "[t]he ALJ states that he does not find claimant credible; however, the ALJ *never* discusses or evaluates Mr. Mathis' subjective complaints . . . ."  (DE 15 at 12)  (emphasis added).  As discussed previously, that argument is fallacious because the ALJ did discuss Plaintiff's subjective complaints.  Nonetheless, the Court will leniently construe Plaintiff as also generally arguing that the ALJ erred in assessing Plaintiff's credibility.

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor."  *Infantado,* 263 Fed. App'x at 475; *see also Beavers v. Sec'y of Health, Ed., and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) ("The opportunity to observe the demeanor of a witness, evaluating what is said in the light of how it is said, and

considering how it fits with the rest of the evidence gathered before the person who is conducting the hearing, is invaluable, and should not be discarded lightly.").  "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."  *Rogers*, 486 F.3d at 247.  It is for this reason that the ALJ's credibility findings have at times been characterized as "unchallengeable."  *Payne v. Comm'r Soc. Sec.*, 402 Fed. App'x 109, 113-114 (6th Cir. 2010); see also *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) ("A circuit court . . . may not review a determination of credibility. It is for the Secretary and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony.") (alteration omitted). Nevertheless, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Walters v. Comm'r Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."  *Id*.; see also *Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed. App'x 852, 863 (6th Cir. 2011) ("Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.").

When assessing an individual's credibility, "the ALJ must [first] determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. App'x 370, 371 (6th Cir. 2011).  The ALJ made such a determination here, concluding that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . ." (R. at 26.)   Upon making that finding, the ALJ must next "consider the entire case record" to "evaluate the intensity, persistence, and functional limitations of the symptoms considering objective medical evidence."   20 C.F.R. § 404.1529(c)(1-3).  A non-exhaustive list of relevant factors to be considered by the ALJ include: 1) the claimant's daily activities; 2) location, duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of medication; 5) treatment, other than medication; 6) any measures the claimant uses or has used to relieve his or her pain or other symptoms; and 7) other factors concerning functional limitations and restrictions. *Curler v. Comm'r of Soc. Sec.*, 561 Fed. App'x 464, 474 (6th Cir. 2014); 20 C.F.R. § 404.1529(c)(1-3); *Ewing v. Astrue*, 2011 WL 3843692, at *9 (N.D. Ohio, Aug 12, 2011) ("Social Security Ruling 96-7p requires such factors to be *considered*, not *discussed* . . . .")  (emphasis in original) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006)), *report and recommendation*

*adopted at* 2011 WL 3843703 (N.D. Ohio Aug. 30, 2011). The ALJ must "provide a sufficiently specific explanation for his [or her] credibility determination so that it is clear to the individual and any subsequent reviewers the weight given to the individual's statements and the reasons for that weight." *Malcolm v. Comm'r of Soc. Sec.*, 2015 WL 1439711, at *7 (E.D. Mich. Mar. 27, 2015) (citing *Soc. Sec. Rul.* 96-7p, 1996 WL 374186, at *1 (July 2, 1997)).

Here, the ALJ concluded that although Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms he alleged, his statements concerning the intensity, persistence, and limiting effects of the symptoms "are not entirely credible . . . ." (R. at 26.) To support this conclusion, the ALJ pointed to inconsistencies between Plaintiff's testimony regarding his pain and the medical evidence. For example, the ALJ noted that Plaintiff has had "almost no treatment for his [cervical spine] condition" since receiving an MRI in 2010. (*Id.*) Indeed, the ALJ correctly stated that "[t]here is no evidence that he [Plaintiff] has required invasive procedures or injections or surgery of any kind to treat his cervical spine pain." (*Id.*)[16] An ALJ is permitted to consider the conservative nature of the treatment in assessing the Plaintiff's credibility. *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 417 (6th Cir. 2011). The

---

[16] Also, as was made plain during the Court's discussion of the treatment records of Dr. Ghazwan Atto, Plaintiff's musculoskeletal exams were consistently normal and he repeatedly experienced no pain on inspection.

ALJ also explicitly noted Plaintiff's "near normal range of activities of daily living

. . . ." (*Id.*)   In addition, the ALJ specified that Plaintiff had acknowledged that

marijuana and Vicodin "were nearly effective in treating all of his pain."  (*Id.*)

### a.  Plaintiff's Reason(s) for Ceasing to Work

Although the scattershot nature of Plaintiff's brief makes it difficult to

determine whether he intended the argument to relate to his criticism of the ALJ's

credibility determination, the Court will construe Plaintiff's claim that the ALJ

found that Plaintiff "simply did not want to work" as part of his overarching

credibility argument.  (DE 16 at 13.)

The genesis of this argument is the ALJ's finding that Plaintiff:

> testified that he stopped working in 2012, as he was laid off from his
> union job.  In other words, he did not cease work because of his
> alleged neck and foot problems, but because his employer stopped his
> work.  The claimant also stated that he has not been called back to
> work in over a year for his past job by his union representative.  This
> strongly suggests that the claimant is capable of some work and that
> his physical maladies, although severe[,] do not necessarily prevent
> the claimant from working.

(R. at 26.)  According to Plaintiff, those findings are in "stark contrast" to

Plaintiff's testimony that he was laid off because he was unable to work.  (DE 16 at

13.)  Plaintiff asserts the ALJ's findings are "not within the [sic] substantial

evidence" and there is "no evidence to suggest that Plaintiff was unwilling to

work."  (*Id.*)

Generally, it has been held that an ALJ may properly consider as part of the credibility analysis a claimant's statement that he/she stopped working due to a layoff. *See, e.g., Boggs v. Colvin*, 2015 WL 8147420, at *7 (E.D. Ky. Nov. 5, 2015), *report and recommendation adopted at* 2015 WL 8228829 (E.D. Ky. Dec. 7, 2015). In addition, there is no inherent conflict between Plaintiff's assertion that he was laid off because he could no longer perform the heavy/very heavy work he performed in the past and the ALJ's conclusion that Plaintiff could nonetheless perform medium work, meaning that Plaintiff's failure to seek such medium level work since being laid off could be used as a proper factor in assessing his credibility.

It is not entirely beyond dispute whether Plaintiff ceased working because he simply did not want to continue working. In fact, Plaintiff's testimony on why he ceased working is not a paradigm of clarity. However, even if the Court leniently assumes the ALJ's findings on this point are erroneous, any error would be harmless.[17] The ALJ's credibility determination is based upon other factors, such as the lack of medical evidence to support Plaintiff's subjective complaints of pain, his demeanor and the conservative nature of his treatment. Thus, the ALJ's

---

[17] *See, e.g., Ulman v. Comm'r of Soc. Sec.,* 693 F.3d 709, 714 (6th Cir. 2012) ("We now make explicit what we have previously adopted by implication: harmless error analysis applies to credibility determinations in the social security disability context.").

credibility determination is supported by substantial evidence and, consequently,

Plaintiff's argument fails.

### b.  Time Spent Off Task

Finally, Plaintiff contends the ALJ's finding that Plaintiff could engage in

substantial gainful activity while being off task up to 10% of the workday is "legal

error.  It is hard to imagine that an employer would tolerate almost an hour missed

a day on a sustained basis . . . ."  (DE 16 at 13.)   Notably, Plaintiff cites to no

authority to buttress his argumentative speculation.  On the other hand, the VE

specifically testified that employers would tolerate unscheduled bathroom breaks

that required a worker to be off task up to 10% of the workday.  (R. at 58.)  The

VE explained that her conclusions were not consistent with the DOT but were

instead based upon her "experience performing direct job placement services, labor

market research, and videotapes that have been held consistently for the last 19

years."  (R. at 59.)

An ALJ may rely upon testimony from a VE which conflicts with the DOT

if the VE explains the basis for the conflicting testimony.  SSR 00-4p, 2000 WL

1898704, at *2 (Dec. 4, 2000) ("Neither the DOT nor the VE . . . evidence

automatically 'trumps' when there is a conflict. The adjudicator must resolve the

conflict by determining if the explanation given by the VE or VS is reasonable and

provides a basis for relying on the VE or VS testimony rather than on the DOT

information.").  The VE explained that her testimony was based upon her years of personal experience and pertinent research.  That explanation was reasonable and, thus, the ALJ was permitted to rely upon it.[18]

Plaintiff has not pointed to specific medical evidence which the ALJ overlooked or misconstrued.  In short, the ALJ has provided a sufficiently specific explanation for her credibility determination which is supported by substantial evidence.  The "weight given" to the Plaintiff's statements and "the reasons for that weight" are clear to this subsequent reviewer.  *Malcolm*, 2015 WL 1439711, at *7.

### G.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment (DE 16), **GRANT** Defendant's motion for summary judgment (DE 18), and **AFFIRM** the Commissioner of Social Security's decision.

### III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service,

---

[18] The Court also notes that Plaintiff failed to raise any objections to the ALJ regarding the VE's testimony regarding unscheduled breaks, nor did Plaintiff cross-examine the VE or otherwise seek any contemporaneous clarification regarding her opinion on unscheduled bathroom breaks.

as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: November 16, 2016              s/Anthony P. Patti
                                      Anthony P. Patti
                                      UNITED STATES MAGISTRATE JUDGE

41

I hereby certify that a copy of the foregoing document was sent to parties of record on November 16, 2016, electronically and/or by U.S. Mail.

s/Michael Williams

Case Manager for the
Honorable Anthony P. Patti